UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

STEVEN J. SCHAAR,

        Plaintiff,                      Case No. 18-13151

v                                            Honorable Thomas L. Ludington

UNITED STATES STEEL CORPORATION,

        Defendant.
_____/

**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT, DENYING MOTION FOR SANCTIONS, AND DENYING MOTION FOR ADMISSIONS OF FACT**

On October 9, 2018, Plaintiff Steven J. Schaar filed a complaint against Defendant United States Steel Corporation ("USS"). ECF No. 1. Plaintiff was employed by Defendant as a Technical Industry Manager. Plaintiff alleges that in February 2018, he returned home from a business trip to care for his wife who was experiencing health issues. The next month, Defendant terminated Plaintiff's employment. Plaintiff contends that Defendant violated the Family Medical Leave Act when it terminated his employment.

Subsequently, Defendant filed a motion for summary judgment. ECF No. 13. Two weeks later, it filed a motion for sanctions and a motion for admissions of fact. ECF No. 16. For the following reasons, the motion for summary judgment will be granted and the motion for sanctions and the motion for admissions of fact will be denied.

**I.**

**A.**

Plaintiff began working at USS in 1993. ECF No. 13-4 at PageID.391. Approximately seven years later, he left USS to work at Chrysler. *Id.* He returned to work for USS in 2012. In 2016, Fred Johns, a director within the Customer Quality Engineering Department, promoted

Plaintiff to the position of manager within the Customer Quality Engineering Department. *Id.* at PageID.392.

The Customer Quality Engineering Department is responsible for customer-facing issues, "such as customer claims related to the steel that is delivered to the customer from the mill[,]… investigating any claims made by the customer regarding the quality of the steel product, and then resolving those claims." ECF No. 17 at PageID.711. Plaintiff managed four Customer Quality Engineers ("CQE"), including Michael Kostic. ECF No. 13-4 at PageID.400. Kostic was assigned to the central Tennessee region and his primary account was USS's client Nissan. *Id.*

Nissan was closely associated with Steel Technologies ("Steel Tech"), a steel processor. ECF No. 13-4 at PageID.400. USS paid Steel Tech to be Nissan's primary provider for the "processes of slitting and blanking steel." *Id.* In July 2017, Steel Tech employees began voicing concerns about Kostic, stating that he was not staying in regular contact. Paul Gittere, a Steel Tech Production Manager, sent an internal email to Janna Findley, a Steel Tech Automotive Program Manager. The email provides

> I have emailed [Kostic] numerous times and occasionally I get a response but it is usually I'll get back to you. I realize you are all aware of the fact that he hasn't been in but knowing Michael I do not want Steel Tech to be blamed for any issues with the USS coils. I understand he is having family issues but maybe USS can send someone else in.

ECF No. 13-6 at PageID.455-457. On August 1, 2017, Findley emailed USS, informing USS that Steel Tech had been "seeing very little of Michael [Kostic]." ECF No. 13-7. Gittere said that in the ensuing month, he had only seen Kostic twice. *Id.* at PageID.453. On August 11, 2017, he emailed Findley informing her that "I haven't been calling Michael because he knows they're here and I became tired of calling and emailing him. But I did let him know to call when he had time to watch more." *Id.*

In his deposition, Schaar testified that he was aware of Steel Tech's reports of Kostic's absence.

> At some point, Janna contacted me directly to let me know that she hadn't heard from Michael in some time and wanted to know if he was okay…And it was not uncommon with the Nissan account and Michael's responsibility for me to have not necessarily communicated with him outside of our weekly meetings regarding the activities at Nissan. He was fully responsible for that activity and there were very, very little claims. So it wasn't a reason necessarily to have conversations with him.
>
> So when Janna informed me that Michael had been missing in their world or missing in their eyes, not reporting as he normally would, where he would be in their facility frequently, I reached out to Michael and I did not get any response from him, which was very unusual.
>
> It was later that I found out that Michael was dealing with a series of both health issues and marital issues, which was at that time, I assume, a very big distraction for him.

ECF No. 13-4 at PageID.400-401.

In January 2018, Steel Tech again raised concerns with USS regarding the alleged lack of support they were receiving from Kostic, explaining that they were "still seeing a lack of technical support in Murfreesboro" and that Kostic only visited the plant once a quarter. ECF No. 13-9 at PageID.477. Rose contacted Plaintiff about the issue. ECF No. 13-10. Plaintiff responded to Rose with a lengthy email in support of Kostic and his performance. It provides "Michael [Kostic] generally visits the Steel Technologies facility in Murfreesboro, TN 2-3 times per week. The only exception to this has been in the recent past due to his health issues." *Id.* at PageID.480. Plaintiff explained that Kostic usually met with Steel Tech's Quality Manager when he made his visits rather than the employees who were complaining to USS about his absence. *Id.*

Later that month, a USS Director of Automotive Quality, Tad Rose, met with a USS Sales Director Salianne Williams and a representative from Steel Tech. ECF No. 13-12 at PageID.492. The Steel Tech representative "made it clear that both Mr. Schaar and Mr. Kostic had failed to

support Steel Tech in the manner he believed was appropriate, and that they were seldom available personally to meet with Steel Tech personnel in Tennessee." *Id.*

**B.**

On January 30, 2018, Plaintiff drove ten hours from his house in Birch Run, Michigan to Franklin, Tennessee to conduct Kostic's annual performance review. ECF No. 13-4 at PageID.408, 425. Plaintiff also planned to visit Steel Tech in "a relationship-building effort." *Id.* at PageID.425. Prior to leaving, Plaintiff became aware of a quality issue at the Nissan plant in Canton, Mississippi. At 8:49 a.m., Plaintiff sent an email regarding the issue to Jeff McCulloch, Nissan's Quality Manager,. *Id.*; ECF No. 13-13.[1] During Plaintiff's drive, McCulloch emailed Kostic, stating "This appears to be a steel issue. We need a reapplication asap." ECF No. 13-15 at PageID.510.

The next morning, Plaintiff conducted Kostic's performance review at the Nissan plant in Smyrna, Tennessee. ECF No. 13-16 at PageID.514. After conducting the performance review, Plaintiff and Kostic discussed the quality issue at the Nissan plant in Canton, Mississippi. *Id.* At 10:21a.m., McCulloch sent an email to Kostic stating "We need plant support ASAP." ECF No. 13-17 at PageID.521. Plaintiff saw the email within twenty minutes. ECF No. 13-4 at PageID.429. Later that afternoon, McCulloch emailed Plaintiff asking "Do you have a recovery plan? When will we have good material? When will a representative from USS be in the plant for support? We are experiencing lots of nonproductive time due to this quality issue…" ECF No. 13-17 at PageID.520.

---

[1] In his response brief, Plaintiff states that "The morning of January 30, 2018 a representative of Nissan emailed US Steel to inform them of a quality issue with the steel that had been delivered to their Mississippi stamping plant. Plaintiff received and read that email when he arrived in Tennessee on the evening of January 30." ECF No. 17 at PageID.712-713. This characterization of the facts is contradicted by Plaintiff's deposition testimony in which he testified that he became aware of the situation before he left his house to drive to Tennessee. It is further contradicted by Exhibit 12 to Defendant's motion which is an email sent by Plaintiff to Nissan employees the morning of January 30, 2018 addressing the quality issue.

- 4 -

Rather than travelling to the Nissan plant in Canton, Plaintiff remained at the Nissan plant in Smyrna because goods with the allegedly defective steel had already arrived in Smyrna. Plaintiff testified that "the material had already shipped from the plant so the most logical place to look at the material was in Smyrna and we happened to very coincidentally be where the material would be rather than go back to a facility where the material was already shipped." ECF No. 13-4 at PageID.429. After investigating the cause of the issue, he responded to McCulloch's email at 7:35 p.m., stating:

> I spent time today in the rework area at Smyrna where I was able to get a firsthand look at the issue that you have been experiencing…I am troubled by the information that I have been provided thus far suggesting that the root cause of the lines you see might [be] caused by the material…I'm afraid that as long as you continue with the assumption that the issue is driven by the steel, you may further delay proper identification of the real root cause…The nature of the defect suggests that it is imparted in the stamping process.

ECF No. 13-17 at PageID.519. McCulloch sent an email in response the next morning, stating, "I appreciate you looking at the material condition in Smyrna. I do however disagree that this is the same issue that we have seen in the past…" *Id.* at PageID.518.

The next day, representatives from USS and Nissan met to discuss the quality issue. ECF No. 13-18. At the meeting, it was determined that "USS needed to provide immediate on-site customer support to Nissan at its Canton, MS facility and work collaboratively with Nissan toward an understanding and resolution of the pending quality issue." ECF No. 13-12 at pageID.495. After the meeting, Renae Carnahan of Nissan emailed Salianne Williams of USS with feedback that Carnahan had received. It provided:

> Please save us from these guys at USS…This is the same support we get when we have an issue with their material. They practically refuse to come to the plant and assist in the investigation…They continue to manage quality from another state. No other steel vendor supports us so poorly.

ECF No. 13-19 at PageID.526. Carnahan closed her email to Williams with the warning "Please ensure your teams manage carefully." *Id.* In her affidavit, Williams testified that she understood the reference to "these guys" to be referring to "Steven Schaar and Michael Kostic, as they were the two USS CQE representatives who were personally present at Nissan in Franklin, TN for the February 1, 2018 meeting and were primarily responsible for providing Nissan CQE with support." ECF No. 13-12 at PageID.495.

**C.**

While in Tennessee, Plaintiff received word from his wife, Katrina Schaar, that she was feeling ill. ECF No. 13-4 at PageID.414. She has a heart condition that causes her to experience dizziness and to potentially collapse. *Id.* at PageID.413. On either January 31, 2018 or February 1, 2018, she called Plaintiff to tell him that "she wasn't really feeling well, she was feeling faint, she was feeling dizzy and feeling weak."[2] *Id.* at PageID.414. Mrs. Schaar owns an auditing company and was at an appointment the day she started feeling ill. *Id.* at PageID.393; ECF No. 13-21 at PageID.551. Regardless, she and her employee worked the entire day. ECF No. 13-21 at PageID.551. At the end of the day, her employee dropped her off at her car in Clio, Michigan and Mrs. Schaar drove 57 minutes home to Birch Run, Michigan.

On Thursday, February 1, 2018, Plaintiff drove ten hours back to his house in Birch Run, Michigan. ECF No. 13-4 at PageID.426. Rose had asked Plaintiff to travel to Canton to address the quality issue at the Nissan plant, but Plaintiff had declined. *Id.* at PageID.414-415; ECF No. 13-8 at PageID.467-469. Plaintiff testified that it was not until Plaintiff was driving home that Rose asked him to travel to Mississippi.[3] ECF No. 13-4 at PageID.419.

---

[2] The exact date of the phone call is unclear. Mrs. Schaar testified that it occurred on January 31, but Plaintiff testified that it occurred on February 1. ECF No. 13-21 at PageID.552; ECF No. 13-4 at PageID.414.
[3] Kostic testified that Plaintiff knew before he started driving home that Rose wanted him to go to Mississippi. ECF No. 13-16 at PageID.515.

A. On the return trip in the evening, late afternoon, I held a telephone conversation with Tad Rose whereby we discussed initially the details that I was aware of relative to the issue in Mississippi…and letting him know that I needed to be home to evaluate my wife's condition.

Q. And what did -- what did you specifically say about that?

A. That she was dizzy and that she had the symptoms that she had had historically that were leading to the possibility of a greater event which would require her to be hospitalized that night.

Now, did I specifically say those words? I don't recall my specific words, but I did describe to him her condition. I reminded him that she was in heart failure, that these were life-threatening potentially, and that I needed to evaluate her condition not knowing more details before I could determine whether or not I would be available to go along and assist in Mississippi.

ECF No. 13-4 at PageID.419.

Plaintiff arrived home in Michigan that evening and determined that his wife did not require medical attention. The next day, Friday, February 2, his wife asked him to go to work. ECF No. 13-21 at PageID.553. He drove an hour to Troy, Michigan for work, and then continued to work "throughout the weekend." ECF No. 13-4 at PageID.421; ECF No. 13-21 at PageID.553. In the meantime, Mrs. Schaar's credit card records from that day indicate that she ran various errands on Friday and throughout the weekend, including going out for lunch, shopping, going out to dinner and a movie, and purchasing groceries. ECF No. 13-22.

On Friday at approximately 2:30 p.m., Plaintiff called Roy Gerstenberg, another CQE, and asked him to travel to Canton to address the quality issue. ECF No. 19. Gerstenberg left his home in Birmingham, Alabama and drove three and a half hours to Canton, arriving there at approximately 7:00 p.m. ECF No. 13-20 at PageID.529. However, Gerstenberg was unable to enter the Canton factory because USS's usual contacts at the factory were not present. Rose travelled to the Canton factory and arrived on Sunday, February 4, 2018 to address the quality issue personally. ECF No. 13-8 at PageID.472.

**D.**

On February 2, 2018, as the quality incident in Canton was still being addressed, Plaintiff traveled to Troy for work to meet with Rose for Plaintiff's annual performance review. Plaintiff attached as an exhibit to his response brief a copy of the report of the Performance Review. ECF No. 17-6. Under "Employee Goals," Rose gave Plaintiff an average rating of 3.55 out of 5.0. Plaintiff on the other hand, gave himself an average rating of 5.0 out of 5.0. The report also included an evaluation and comments from Johns, the director of CQE that had promoted Plaintiff in 2016 to his position as manager. ECF No. 17-6. Johns stated

> Rating oneself far exceed in every category sends a message that there is no room to improve, and that you already sit on top of the mountain. To drive a high performing organization, I would like to see CQE Managers who are more humble and open about ways to improve, not just the organization but also themselves. I had assigned Steve, with his agreement, to work on communication but did not see any effort from his side to find ways to do this. I had recommended a program in Atlanta that we both go to, but there was no drive from Steve to go after this or any other effort that I know of.

*Id.* at PageID.794. Johns specifically mentioned Plaintiff's "relationship building" with Nissan, stating that Johns "did not see a big effort for Nissan from Steve personally." *Id.* Rose's comments in the same section provided "While Steve excels in the fundamentals of steel and the CQE role, he is falling behind in his role as a manager." *Id.*

Under "Core Competencies," Rose gave Plaintiff an average rating of 2.67 out of 5. *Id.* at PageID.797. Johns comments provide "Steve has incredible passion and drive to ensure US Steel is seen as number 1 with our customers…Steve can improve by focusing more on helping others, and worrying less about how he is perceived." *Id.*

Later that month, Rose emailed Lori Scaglione of USS's Human Resources to discuss potential disciplinary actions for Plaintiff's handling of the qualify issue in Canton. ECF No. 13-25. He provided a detailed summary of Plaintiff's past actions with the Nissan account and

Plaintiff's actions during the quality incident in Canton. He further explained that much of Plaintiff's justification for not addressing the Canton situation personally was due to the health of Plaintiff's wife. Rose's email concluded with:

> Although Steve's Performance Review may reflect a "Meets" rating, I believe this level of insubordination and impact to the customer should open the door for formal discipline up to and including firing. In this scenario Steve was under no formal health or travel restrictions and refused multiple times to perform to both USS and Nissan expectations for requested support. These refusals were delivered to the customer multiple times, dating back to July 2017, with no escalation for help, discussion or alert to management. The final impact on our customer relationship drives Nissan to ask if Steve can be reassigned away from the Nissan account.

*Id.* at PageID.597. Shortly thereafter, Rose sent Scaglione and Johns the email chain documenting Plaintiff's response to the Nissan representative, McCulloch. ECF No. 13-26. Johns responded to Rose and Scagione with

> Nissan is asking very simple questions, and they deserve simple answers not long winded rebuttal. This will continue to frustrate the customer, and put U.S. Steel business at risk. Steve is clearly not meeting the role we have defined for a CQE Manager.

ECF No. 13-26 at PageID.602.

The next month, USS terminated Plaintiff's employment. The termination notice provided that "Recent customer interactions and support have inappropriate [sic] and unprofessional. Steven has been counseled on the interactions and no changes were made. The recent interactions has [sic] caused tension between USS and the customer." ECF No. 13-28.

## II.

Defendant has filed a motion for summary judgment. A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of identifying where to look in the record for evidence "which it believes

demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party who must set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted). The Court must view the evidence and draw all reasonable inferences in favor of the non-movant and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251–52.

### III.

Plaintiff claims that Defendant violated the Family and Medical Leave Act ("FMLA"). The FMLA makes it unlawful for an employer to "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter," or to retaliate or discriminate against an employee exercising FMLA rights. 29 U.S.C.A. § 2615(a)(1)-(2). Sixth Circuit precedent recognizes two distinct theories of recovery for FMLA wrongdoing. *Bryson v. Regis Corp.*, 498 F.3d 561, 570 (6th Cir. 2007). The "entitlement" or "interference" theory arises from § 2615(a)(1), which prohibits an employer from interfering with an employee's exercise of her FMLA rights or wrongfully denying those rights, and requires the employer to restore the employee to the same or an equivalent position upon his return from FMLA leave. *Id.* The "retaliation" theory, on the other hand, arises from § 2615(a)(2), which prohibits an employer from taking any adverse action against an employee for exercising or attempting to exercise his rights under the Act. *Id.*

Plaintiff asserts two claims for relief: 1) interference with the exercise of his FMLA rights; and 2) retaliation for his attempts to exercise his FMLA rights. Each will be addressed in turn.

### A.

To establish a claim for interference under the FMLA, a plaintiff must demonstrate that (1) he is an eligible employee, (2) the defendant is an employer as defined under the FMLA, (3) the employee was entitled to leave under the FMLA, (4) the employee gave the employer notice of his intention to take leave, and (5) the employer denied the employee FMLA benefits to which he was entitled. *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 308 (6th Cir. 2016). "A benefit is denied if an employer interferes with the FMLA-created right to medical leave or to reinstatement following the leave." *Id.*

There is no dispute as to elements one and two. The parties do, however, dispute the final three elements.

**i.**

Defendant contends that Plaintiff was not entitled to leave under the FMLA. The FMLA permits employees leave to provide care for a spouse. It provides,

> [A]n eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period…[i]n order to care for the spouse…of the employee, if such spouse…has a serious health condition.

29 U.S.C. §2612(a)(1)(C). The FMLA defines "serious health condition" as

> [A]n illness, injury, impairment, or physical or mental condition that involves--
>
> (A) inpatient care in a hospital, hospice, or residential medical care facility; or
>
> (B) continuing treatment by a health care provider.

29 U.S.C. §2611(11). Neither party contests that Mrs. Schaar is Plaintiff's spouse nor that she has a "serious health condition."

The parties do contest whether Plaintiff provided care for Mrs. Schaar during the days Rose requested Plaintiff to visit the Nissan factory in Canton. The FMLA does not define the term "to care for," but Defendant quotes the Department of Labor's implementing regulations defining the

term, 29 C.F.R. §825.124(a). ECF No. 13 at PageID.366; *see also Overley v. Covenant Transport, Inc.*, 178 Fed.Appx. 488, 494 (6th Cir. 2006) ("The reason for the leave must fall under the statute and accompanying regulations…"). The regulation provides

> The medical certification provision that an employee is needed to care for a family member or covered servicemember encompasses both physical and psychological care. It includes situations where, for example, because of a serious health condition, the family member is unable to care for his or her own basic medical, hygienic, or nutritional needs or safety, or is unable to transport himself or herself to the doctor. The term also includes providing psychological comfort and reassurance which would be beneficial to a child, spouse or parent with a serious health condition who is receiving inpatient or home care.

29 C.F.R. §825.124. Defendant contends that Plaintiff cannot establish that he was caring for Mrs. Schaar because "he has provided no evidence that Katrina Schaar was unable to care for her own needs, or was receiving inpatient or home care." ECF No. 13 at PageID.367.

Plaintiff argues that 29 C.F.R. §825.124(a) is not an exhaustive list because it uses the term "for example." This argument is unpersuasive. Though the list is not exhaustive, it does provide guidance by presenting examples of situations that would qualify under the FMLA. Plaintiff's situation differs too greatly from the examples presented. He has not demonstrated that he was "needed to care for" Mrs. Schaar. *Romans v. Mich. Dep't. of Human Servs.*, 668 F.3d 826, 840 (6th Cir. 2012) ("Under FMLA regulations, an employee must be 'needed to care for' the family member in order to be entitled to FMLA leave…"). Plaintiff testified that he drove home to "observe" or "evaluate" Mrs. Schaar, not to provide care for her.

Mrs. Schaar's conduct reflects that she was able to care for herself even though she was worried about going into cardiac arrest. She first felt ill on Thursday, but completed her work day and drove almost an hour from Clio to Birch Run. The next day, she told Plaintiff to leave her at home and go to work. That day and throughout the weekend, she completed various errands and

activities in the surrounding area as Plaintiff continued to work. Such actions demonstrate that she did not require the type of care contemplated by the FMLA.

**ii.**

Plaintiff also cannot fulfill the fourth element of his prima facie case because he did not give Defendant adequate notice of his request for FMLA leave. Plaintiff contends that he gave Defendant notice of his request when he told Rose that he would not travel to Canton due to Mrs. Schaar's health condition. Plaintiff asserts that he was requesting leave under the FMLA as "a reduced leave schedule."

Under the FMLA, leave "may be taken intermittently or on a reduced leave schedule when medically necessary." 29 U.S.C. §2612(b)(1). When taking FMLA leave for the first time, an employee is not required to expressly state that they are taking FMLA leave. 29 C.F.R. §825.303(b) ("When an employee seeks leave for the first time for a FMLA–qualifying reason, the employee need not expressly assert rights under the FMLA or even mention the FMLA."). The regulation places an obligation upon the employer "to obtain any additional required information through informal means." *Id.* In determining whether an employee gave adequate notice of an FMLA request, the Sixth Circuit has held that "the critical test for substantively-sufficient notice is whether the information that the employee conveyed to the employer was reasonably adequate to apprise the employer of the employee's request to take leave for a serious health condition that rendered him unable to perform his job." *Brenneman v. MedCentral Health System*, 366 F.3d 412, 421 (6th Cir. 2004).

Plaintiff first broached the subject of taking time off work for his wife's health when he told Rose that he could not travel to Canton. ECF No. 13-4 at PageID.419-420 ("I reminded [Rose] that she was in heart failure, that these were life-threatening potentially, and that I needed to

evaluate her condition."); *see also id.* at PageID.415 ("I told Tad that I had to go home and then make an evaluation of her condition…"). Plaintiff drove home, arriving in Birch Run on Thursday night and "worked throughout the weekend." ECF No. 13-4 at PageID.421.

Plaintiff did not communicate with Defendant that he wished to take leave or be given a reduced work load. Though he returned home against the express requests of Rose, he continued to work throughout the weekend. Defendant cannot be expected to know that Plaintiff was requesting leave when he refused to travel to Canton, but then continued to work upon his return to Michigan. Additionally, Plaintiff did not tell Rose that he was returning to Michigan to care for his wife. Instead, he told Rose that he was going home to "evaluate her condition."

Plaintiff attempts to avoid this argument, by contending that traveling is part of his employment and "[t]herefore, when he requests not to have to travel to Mississippi in February 2018, he is clearly requesting a reduced work schedule." ECF No. 17 at PageID.725. This argument is untenable. Defendant cannot be expected to make the inferential leap that Plaintiff's refusal to go on a business trip doubled as a request for a reduced work schedule pursuant to the FMLA. Plaintiff worked the day after refusing to travel to Canton and continued to work throughout the weekend. Though travel is one aspect of Plaintiff's work, his refusal to make one business trip to evaluate his wife's health situation does not qualify as communicating to his employer a request to work a reduced schedule.

Plaintiff was requesting that Defendant accommodate his travel schedule to permit him to remain in a close geographic vicinity to his wife. The FMLA does not provide for such accommodations. *Tillotson v. Manitowoc Company, Inc.*, 727 Fed.Appx. 164, 170 (holding that the plaintiff's "request for travel accommodations is not protected conduct under the FMLA because the FMLA does not appear to have a freestanding reasonable-accommodations provision

and the leave provisions of the FMLA are wholly distinct from the reasonable accommodations obligation of employers covered under the ADA.")(quotations omitted).

### iii.

The fifth element of Plaintiff's FMLA interference claim, denial of an FMLA right by Defendant, cannot be met because Plaintiff was not entitled to FMLA leave. Plaintiff has not met the third, fourth, or fifth elements of his FMLA interference claim. Accordingly, the count alleging FMLA interference by Defendant will be dismissed.

### B.

"Absent direct evidence of unlawful conduct, FMLA-retaliation claims are evaluated according to the tripartite burden-shifting framework announced in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973)." *Bryson v. Regis Corp.*, 498 F.3d 561, 570 (6th Cir. 2007). To establish a prima facie case of FMLA retaliation, a plaintiff must show "(1) she was engaged in an activity protected by the FMLA; (2) the employer knew that she was exercising her rights under the FMLA; (3) after learning of the employee's exercise of FMLA rights, the employer took an employment action adverse to her; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action." *Donald v. Sybra, Inc.*, 667 F.3d 757, 761 (6th Cir. 2012).

As established above, Plaintiff was not engaged in an activity protected by the FMLA. *See* III.A. He cannot satisfy any of the prima facie elements of his FMLA retaliation claim. Accordingly, the count alleging FMLA retaliation by Defendant will be dismissed.

### IV.

Soon after filing its motion for summary judgment, Defendant filed a "Motion for Sanctions and Admissions of Fact."[4] ECF No. 16. Rule 11 of the Federal Rules of Civil Procedures addresses sanctions, providing

> By presenting to the court a pleading, written motion, or other paper…an attorney…certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances…the factual contentions have evidentiary support…

Fed R. Civ. Pr. 11(b). It further provides that

> If…the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation.

Fed R. Civ. Pr. 11(c)(1). The Supreme Court has cautioned that a court's power to sanction "must be exercised with restraint and discretion." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991).

Defendant contends that sanctions should be issued against Plaintiff because Mrs. Schaar's credit card statements indicate that she was not confined to her bed from February 1 to February 4. ECF No. 16. Instead, she ran errands, went out to eat twice, and attended a movie. Defendant argues that Plaintiff should be sanctioned because he was aware of Mrs. Schaar's activities, but continued to pursue his FMLA claim.

Mrs. Schaar's active schedule during these dates calls into question the gravity of her health condition during the period and her need for Plaintiff's presence. However, it does not necessarily assist in understanding Plaintiff's knowledge of her health and thus, his FMLA violation claim. The FMLA permits individuals to care for family members. Plaintiff bringing his claim of an FMLA violation on this basis does not rise to level of sanctionable behavior.

---

[4] Pursuant to Federal Rule of Civil Procedure 11(c)(2), "[a] motion for sanction must be made separately from any other motion…" Defendant combined its motion for sanctions and its motion for admissions of fact. Despite Rule 11(c)(2), Plaintiff has not objected to Defendant's combination of the two motions. Consequently, both motions will be addressed.

Defendant's motion to sanction Plaintiff will be denied. Defendant's motion for admissions of fact will be denied as moot since Defendant's motion for summary judgment will be granted according to the evidence already presented.

**V.**

Accordingly, it is **ORDERED** that Defendant's motion for summary judgment, ECF No. 13, is **GRANTED**.

It is further **ORDERED** that Defendant's motion for sanctions, ECF No. 16, is **DENIED**.

It is further **ORDERED** that Defendant's motion for admissions of fact, ECF No. 16, is **DENIED**.

Dated: October 18, 2019     s/Thomas L. Ludington
                            THOMAS L. LUDINGTON
                            United States District Judge